[Cite as *In re A.C.*, 2014-Ohio-4402.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY   COUNTY**

| | | |
|---|---|---|
| IN RE: A.C. | : | |
| | : | Appellate Case No. 26211 |
| | : | |
| | : | Trial Court Case No. 2012-5146 |
| | : | |
| | : | (Civil Appeal from Common |
| | : | Pleas Court, Juvenile Division) |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the 3rd day of October, 2014.

. . . . . . . . . . .

APRIL F. CAMPBELL, Atty. Reg. No. 0089541, Assistant Prosecuting Attorney, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, 120 W. Second Street, Suite 400, Dayton, Ohio 45402
        Attorney for Appellant/Father

MELISSA M. REPLOGLE, Atty. Reg. No. 0084215, 2312 Far Hills Avenue, Suite 145, Dayton, Ohio 45419
        Attorney for Appellee/Mother

JAMES S. ARMSTRONG, Atty. Reg. No. 0020638, 131 N. Ludlow Street, Suite 386, Dayton, Ohio 45402
        Guardian Ad Litem

. . . . . . . . . . . . .

HALL, J.

{¶ 1} J.C. ("Father") appeals from the trial court's judgment entry awarding Montgomery County Children Services (MCCS) permanent custody of his child, A.C.

{¶ 2} Father advances two assignments of error in this expedited appeal. First, he contends the trial court erred in granting MCCS permanent custody where the agency failed to prove by clear and convincing evidence that such a disposition was in the child's best interest. Second, he claims the grant of permanent custody was erroneous because MCCS failed to prove by clear and convincing evidence that the child could not be placed with him within a reasonable time.

{¶ 3} The record reflects that A.C. was born in January 2012. At the time of birth, Father was residing with R.J. ("Mother"), the child's mother. In the proceedings below, Father testified that he was A.C.'s primary care-giver for about six months after birth. In the first half of 2012, Father and Mother's relationship deteriorated. Father moved to New Paris, Ohio. For a short time, Mother and A.C. rejoined him there. According to Father, Mother and the child then moved out.

{¶ 4} In July 2012, MCCS filed a dependency complaint, alleging that A.C. lacked adequate parental care and that the child's condition or environment warranted intervention.[1] More specifically, the complaint alleged, among other things, that both parents had substance-abuse problems, that Father had domestic-violence issues, that both parents were unemployed, and that Mother had periods of homelessness and unstable housing. The agency became involved upon learning that Mother had left A.C. in the care of a third party and had not

---

[1] The complaint also addressed another of Mother's children who has a different father. That child is not at issue here.

returned or been heard from for eight days. (Tr. at 44). After an order of interim temporary custody to MCCS, A.C. was adjudicated dependent. MCCS then obtained full temporary custody in October 2012. While in the agency's care, A.C. resided in a foster home, where she remained throughout the proceedings below.

{¶ 5} In May 2013, MCCS moved for permanent custody, arguing that Mother had not followed through with her case plan and that she had continued to test positive for amphetamines, benzodiazepines, cocaine, and opiates. As for Father, MCCS asserted that he had maintained little contact with the agency or with A.C. The matter proceeded to an August 2013 hearing on the permanent-custody issue and other motions.[2] Based on the evidence presented, a magistrate awarded MCCS permanent custody of A.C. Father timely objected. On April 9, 2014, the trial court filed a decision and judgment entry in which it independently reviewed the record, made its own findings, addressed and overruled all objections, and adopted the magistrate's decision. (Doc. #4). This timely appeal by Father followed.[3]

{¶ 6} The standards governing permanent-custody determinations are as follows:

R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a

---

[2] The disposition of one of Mother's other children with a different father also was addressed at the hearing. That issue is not before us.

[3] Mother has not challenged the permanent-custody decision and has not participated in this appeal.

reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period. * * *

R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

*In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14–15.     **{¶ 7}** Here the trial court made the findings required to award MCCS permanent custody. Specifically, it found by clear and convincing evidence that A.C. could not be placed with either parent within a reasonable time and that an award of permanent custody to the agency was in the child's best interest. Although Father challenges both determinations, we find clear and convincing evidence to support them.

{¶ 8} The trial court found that A.C. could not be placed with either parent within a reasonable time pursuant to R.C. 2151.414(E)(1), which provides:

(E) In determining * * * whether a child cannot be placed with either parent within a reasonable period of time * * *, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time * * *:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

R.C. 2151.414(E)(1).

{¶ 9} Here the trial court determined that both parents had made inadequate progress on their case-plan objectives, despite having opportunities to do so, and that A.C. could not be placed with them within a reasonable time. During the hearing below, MCCS caseworker Paula Long identified Father's case-plan objectives as (1) completing substance-abuse treatment and

following recommendations, (2) participating in a batterer's intervention group, (3) participating in parenting education, (4) complying with the terms of probation, (5) signing necessary releases, and (6) maintaining income and housing. (Tr. at 56).

{¶ 10} Long testified that Father was referred for substance-abuse treatment because of drug and alcohol use and his three OVI offenses. (*Id*.). To Long's knowledge, Father had failed to follow through on a referral for a substance-abuse assessment. (*Id*.). Between September 2012 and May 2013, Father also had failed to have contact with her despite her scheduling home visits and visits for him with A.C. (*Id*. at 57). Long mailed him referrals and left phone messages, but very seldom got any response. (*Id*. at 65-66). In May or June 2013, Father finally contacted her and informed her he was about to be sent to the River City Correctional facility. (*Id*.).

{¶ 11} With regard to the domestic-battery issue, Long stated that Father was on probation for felony domestic violence and that he had failed to follow through on a referral to a batterer's-intervention program.[4] (*Id*.). Father also had failed to follow through with a referral for parenting classes. (*Id*. at 57-58). In addition, Father had visited A.C. only one time in the roughly thirteen months or so that MCCS had been involved in the case. (*Id*. at 57-58, 71). Long testified: "He missed two visits in a row, and, well, he's never come. I mean, he just—he didn't come to visit at all." (*Id*. at 65). According to Long, Father had attributed his lack of visits to his heavy use of alcohol. (*Id*. at 71, 85).

{¶ 12} With regard to income, Long testified that Father had reported working a construction job the prior summer before being laid off. To her knowledge, he had no income at

---

[4] The record reflects that Father had been convicted of third-degree felony domestic violence in 2011. (Tr. at 134). That offense was his fourth domestic-violence conviction. (*Id.* at 140-141).

the time of the hearing. (*Id*. at 58-59).

{¶ 13}   Finally, with regard to housing, Long noted that Father was residing at the River City Correctional facility, where a substance-abuse treatment program was offered. (*Id*. at 59). He was sent there in lieu of a ninety-day jail sentence in Preble County for a third OVI offense that occurred in June 2013 and/or for a community control violation on his 2011 felony domestic-violence conviction. (*Id*. at 31, 131, 134-135, 139). According to Long, Father planned to live with his grandmother upon his release from the River City facility. Long deemed grandmother's house "appropriate." (*Id*. at 58).

{¶ 14}   The record reflects that Father entered the River City facility in late June 2013 and that his stay was anticipated to be up to six months. (*Id*. at 32-33). The batterer's intervention program that was part of Father's case plan was not available at River City. Given his failure to follow up on a referral prior to being sent to River City, he would have to wait until his release to start it. (*Id*. at 86).

{¶ 15}   When asked why she believed Father could not be reunited with A.C. within a reasonable time, Long responded: "He just began treatment. I'm not sure how long it's going to take for him to complete the treatment. It is a voluntary program. He could leave. He's not had a relationship with [A.C.]. He's only visited with her once. And then, again, he's not completed his case plan objectives." (*Id*. at 81).

{¶ 16}   A.C.'s guardian ad litem, attorney James Armstrong, also testified at the permanent-custody hearing. Armstrong stated that he met with Father once when the case was opened. (*Id*. at 113). He described later making efforts to reach Father and leaving numerous messages. (*Id*.) He eventually located Father at the Preble County jail shortly

before the transfer to the River City facility. (*Id.* at 114). When asked why he believed Father could not be reunited with A.C. within a reasonable time and why an extension of temporary custody should not be ordered, Armstrong explained:

Well, [Father] is in his program now. The information I had was that it was a voluntary program. I—in light of his appearance here in jail dress, I'm not sure it's a voluntary program, because I would think that he could have simply showed them his paperwork and been permitted to come without being conveyed by the police.

But it's mainly his lack of ongoing substance abuse issues, including the OVI, his third OVI, from a few months ago, and primarily his lack of engagement with [A.C.].

He's had one visit and [A.C.] is 19 months old, and she has—she's pretty much assimilated into the foster family. They have young children in the home. I mean, that's—that's basically become her family at this point in time.

\* \* \*

[Permanent custody] was my recommendation, and—and just to say, part of that also is that July was the—was the [expiration] of the temporary custody, so an extension would take us through sometime in January. So if [Father] does complete the program, as Ms. Long indicated, he's going to come out of the program; he still has to do the domestic violence and still has to—has to demonstrate some period of sobriety.

I believe his second OVI was in 2008, so that was five years ago, and he's still continuing to engage in the same type of, you know, behaviors, which indicates that it's longstanding, and that usually indicates it takes a longer period of time for recovery.

And then, of course, he would have to come out and try to develop a relationship with [A.C.].

And so we're talking—I mean, there's not going to be any possibility of reunification with [Father] during the period of first extension. The only possibility would be the—at the end of the second extension, and that would be—you know, that would be somewhat questionable even at that point.

(Tr. at 115-117).

{¶ 17} In our view, the record supports a finding that Father continuously and repeatedly failed to make substantial progress on his case plan despite reasonable and diligent efforts by MCCS to assist him. The trial court did not err in finding by clear and convincing evidence that A.C. could not be reunited with him within a reasonable time. In opposition to this conclusion, Father opines that he could have completed "most" of his case-plan objectives by the time a first extension of temporary custody would have expired, if one had been granted. (Appellant's brief at 5-6).[5] He also argues that he had a "bond" with A.C. and that his one visit went well. (*Id.*).

---

[5] Father claims he actually did complete the case-plan objectives after the permanent-custody hearing, that he now has been released from the River City facility, that he is gainfully employed, and that he has weekly visits with A.C. (Appellant's brief at 6). But these alleged post-judgment facts are not in evidence. The question before us is whether the evidence before the trial court supports its judgment, not whether Father may have taken positive steps after the trial court's decision.

{¶ 18} We note, however, that MCCS was not required to seek an extension of temporary custody. Under R.C. 2151.415(A), the agency was entitled to move for permanent custody rather than to seek an extension.[6] Given the agency's decision to seek permanent custody, the relevant question is whether clear and convincing evidence supports the trial court's finding that A.C. could not be returned to Father within a reasonable time. We believe that it does. Father was unemployed at the time of the custody hearing and residing in a residential treatment facility in lieu of a jail sentence imposed in connection with his most recent OVI offense. Father was anticipating a stay of at least several more months. At the time of the hearing, he had not completed various aspects of his case plan and had shown little initiative in following up with his caseworker or with referrals to assist him. He also had maintained almost no contact with his child for more than a year.

{¶ 19} As for Father's argument about his bond with A.C. and his positive visit, those facts relate more to the best-interest issue. In any event, the record reflects that Father saw his child—who was about six months old when MCCS became involved and about nineteen months old at the time of the hearing—just once in roughly thirteen months. Although he blamed a lack of transportation, caseworker Long testified that he had attributed his lack of visits to heavy drinking. We note too that Father had transportation available when he committed his third OVI offense during the pendency of this case. In short, nothing in Father's argument persuades us the trial court erred in finding that A.C. could not be placed with him within a reasonable time.

---

[6] We note too that an extension of temporary custody is not warranted unless "there has been significant progress on the case plan of the child" and "there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension." R.C. 2151.415(D)(1).

{¶ 20}   The record also supports the trial court's finding that an award of permanent custody to MCCS was in the child's best interest. On this issue, Father notes that "visitation" was not a formal part of his case-plan objectives. He also points out that he became incarcerated on the most recent OVI offense in June 2013 and could not visit thereafter. He attributes his lack of prior visitation to "transportation issues." Father additionally argues that he was a "daily part" of his child's life for the first six months. Finally, he stresses that his one visit with the child went well.

{¶ 21}   In finding that A.C.'s best interest was served by awarding permanent custody to MCCS, the trial court properly considered the statutory best-interest factors. (Doc. #4 at 7-8). With regard to the child's interaction and interrelationship with others and her custodial history, the trial court noted that A.C. had been in the same foster placement since July 2012. The foster family included one of A.C.'s siblings and three other children. A.C. was bonded with her foster parents, who desired to adopt. (Tr. at 75-76, 79). As for Father, the trial court noted that he had attended only one visitation session. (*Id*. at 71). The trial court also found a need for A.C. to obtain a legally secure placement, which it determined could not be done without an award of permanent custody to MCCS. On this issue, the trial court noted that Father had not satisfactorily addressed his substance abuse and domestic violence issues at the time of the hearing. The trial court also noted the absence of any other relatives who were willing and able to care for A.C. As a result, the trial court agreed with the guardian ad litem's assessment that an award of permanent custody was in the child's best interest.

{¶ 22}   Upon review, we see no basis for reversing the trial court's best-interest

determination, which is supported by the record. As for Father's arguments, the fact that "visitation" was not identified as a formal case-plan objective does not mean the trial court could not consider his lack of visitation when considering A.C.'s best interest. Although Father became incarcerated in June 2013, we note that A.C. went into MCCS's care in the summer of 2012. Thus, Father's incarceration fails to explain his lack of visits for most of the time at issue. The trial court also was free to disbelieve Father's claim that a lack of transportation prevented him from visiting. As noted above, caseworker Long testified that Father had attributed his lack of visits to heavy drinking, not transportation issues. Moreover, the fact that Father committed an OVI offense during the pendency of this case suggests he did have some transportation. Finally, the fact that Father may have been the primary care-giver for the first six months of A.C.'s life does not demonstrate error in the trial court's best-interest finding. As noted above, Father had seen the child only once since that time.

{¶ 23} Based on the reasoning set forth above, we overrule Father's assignments of error and affirm the judgment of the Montgomery County Common Pleas Court, Juvenile Division.

. . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies mailed to:

April F. Campbell
Lucas W. Wilder

Melissa M. Replogle
James S. Armstrong
Hon. Anthony Capizzi